985 P.2d 353 (1999)
139 Wash.2d 129
The WASHINGTON STATE LEGISLATURE, J. Clyde Ballard, and Daniel R. McDonald, Respondents,
v.
The STATE of Washington; Gary Locke, a state officer in his capacity as Governor of the State of Washington; The Office of Financial Management, an agency of the executive branch of the State of Washington; Richard Thompson, a state officer in his capacity as Director of the Office of Financial Management; The Department of Ecology, an agency of the executive branch of the State of Washington; Thomas Fitzsimmons, a state officer in his capacity as Director of the Department of Ecology; The Department of Social and Health Services, an agency of the executive branch of the State of Washington; Lyle Quasim, a state officer in his capacity as Secretary of the Department of Social and Health Services; and Michael J. Murphy, a state officer in his capacity as State Treasurer, Appellants.
No. 66710-1.
Supreme Court of Washington, En Banc.
Argued February 25, 1999.
Decided October 7, 1999.
*355 Christine Gregoire, Attorney General, Maureen A. Hart, Asst., Olympia, for Appellants.
Davis, Wright & Tremaine, Michele G. Radosevich, Seattle, for Respondents.
*354 TALMADGE, J.
We are asked in this case to consider the scope of the Governor's authority to veto appropriation items under art. III, § 12 (amend.62) of the Washington State Constitution in light of our decision in Washington State Legislature v. Lowry, 131 Wash.2d 309, 931 P.2d 885 (1997). We are also asked to determine if a provision in an omnibus appropriations or operating budget bill is substantive law so as to violate art. II, § 19 of the Washington Constitution. We hold the Governor's veto of a portion of the Laws of 1997, ch. 454, § 204(6) was ineffective because the Governor did not veto the full appropriations item as he must under his constitutional line item veto authority. We also hold the inclusion of provisions in § 204(6) pertaining to a child care copayment schedule was improper because such provisions were substantive law in an operating budget bill and void under art. II, § 19. We reverse the trial court's judgment and remand this case to the Thurston County Superior Court for further proceedings consistent with this opinion.

ISSUES
1. Did the Governor properly veto (a), (b) and (c) of the Laws of 1997, ch. 454, § 204(6) pursuant to his line item veto power under art. III, § 12 (amend.62)?
2. Are the copayment provisions of the Laws of 1997, ch. 454, § 204(6), substantive law and therefore violative of art. II, § 19 because they are contained in the operating budget bill?

FACTS
In 1997, the Legislature enacted welfare reform legislation, the Washington WorkFirst temporary assistance for needy families act (the Act). Laws of 1997, ch. 58, § 2. As part of such legislation, the Legislature initially required poor families in WorkFirst and other welfare programs and needing child care assistance to make copayments. Laws of 1997, ch. 58, § 402.[1] Believing these *356 copay amounts to be beyond the means of poor families, Governor Gary Locke vetoed section 402 of the Act, stating:
Affordable child care is a crucial part of successfully moving people from welfare to work. The copays specified in this provision are higher than a low-income working family can afford. Work does not pay under the schedule in section 402. As written, this provision would hinder WorkFirst participants' ability to take responsibility for their families and become self-sufficient.
I will direct DSHS to implement a modified copay schedule that will support the principles of WorkFirst.
See Laws of 1997, ch. 58, at 371 (Governor's veto message).
Instead of attempting to override the Governor's veto of section 402 of the Act, the Legislature included child care assistance copay requirements and schedules in the operating budget as provisos to the Department of Social and Health Services (DSHS) appropriation. In 1997, the Legislature passed two operating budget bills. In the first budget, Laws of 1997, ch. 149, the Legislature expressly conditioned the appropriation for child care services for welfare recipients after passage of the Act on the enactment of section 402 of that reform legislationthe copay schedules:
(6) $73,129,000 of the general fundfederal appropriation is provided solely in implement section 402 of Engrossed House Bill No. 3901 (implementing welfare reform). If section 402 of the bill is not enacted by June 30, 1997, the amount provided in this subsection shall lapse.
Laws of 1997, ch. 149 § 207(6). The Governor vetoed this dollar proviso to the overall DSHS budget. The Legislature did not override this veto.
Subsequently, the Legislature enacted a second operating budget bill, Laws of 1997, ch. 454. The Legislature appropriated a total of $2,025,753,000 for the Economic Services Program of DSHS. Laws of 1997, ch. 454, § 204. The appropriation was made subject to conditions or limitations set forth in nine numbered subsections. Section 204(6) of that legislation specifically addressed funds for child care services, stating:
(6) $73,129,000 of the general fundfederal appropriation is provided solely for child care assistance for low-income families in the WorkFirst program and for low-income working families as authorized in Engrossed House Bill No. 3901 (implementing welfare reform). All child care assistance provided shall be subject to a monthly copay to be paid by the family receiving the assistance.
(a) The monthly copay required shall be a minimum of ten dollars for families with incomes below seventy-four percent of the federal poverty level adjusted for family size. For families with incomes at or above seventy-four percent of the federal poverty level adjusted for family size, the monthly copay shall be the greater of twenty dollars or forty-seven percent of the family's income above one hundred percent of the federal poverty level adjusted for family size. Child care assistance shall not be provided to families with incomes above one hundred seventy-five percent of the federal poverty level adjusted for family size.
(b) The copay schedule defined in (a) of this subsection shall be in effect unless the department establishes a waiting list for the child care assistance program authorized in Engrossed House Bill No. 3901 (implementing welfare reform) or unless the quarterly reports required by section 321 of the bill indicate that child care expenditures will exceed appropriations made for that purpose at the end of the fiscal year.
(c) If either of the conditions in (b) of this subsection occurs, the monthly copay required shall be a minimum of ten dollars per month for families with incomes below seventy-four percent of the federal poverty level adjusted for family size. For families *357 with incomes at or above seventy-four percent of the federal poverty level adjusted for family size, the monthly copay shall be the greater of ten dollars or thirty percent of the family's income above seventy-four percent of the federal poverty level adjusted for family size. For families with incomes at or above one hundred percent of the federal poverty level adjusted for family size, the monthly copay shall be the greater of one hundred dollars or twenty-nine percent of the family's income in excess of seventy-four percent of the federal poverty level adjusted for family size. For families with incomes at or above one hundred thirty-one percent of the federal poverty level adjusted for family size, the monthly copay shall be fifty percent of the family's income in excess of one hundred percent of the federal poverty level adjusted for family size. Child care assistance shall not be provided to families with incomes above one hundred seventy-five percent of the federal poverty level adjusted for family size.
Laws of 1997, ch. 454 § 204(6). The Legislature conditioned the appropriation on its use for child care assistance for families participating in the WorkFirst program created by the Act. The Legislature also added a child care copayment schedule in the three subparts to paragraph (6).
The Governor again vetoed the copayment schedules appearing as (a), (b) and (c) of § 204(6). The vetoed paragraphs set forth formulae for determining copayment amounts (i.e., copayment and contingent copayment schedules). However, the Governor left in place the paragraph appearing at subsection (6), designating $73,129,000 of the more than $2 billion total appropriation under § 204 "solely for child care assistance" for families in designated programs. He also left in place the last sentence of that paragraph requiring copayments by all families receiving child care assistance. In his veto message, the Governor set out his own proposed copayment schedule and directed DSHS to implement by rule a more flexible child care program, stating:[2]
Affordable child care is a crucial part of successfully moving people from welfare to work. To effectively administer a child care assistance program for low-income families within the amounts appropriated by the Legislature, the Department must have the flexibility to devise a workable co-payment schedule that keeps the program solvent while still providing the assistance necessary to keep low income parents in the work force. Therefore, I have vetoed the co-payment schedule outlined in this section, because it does not provide the Department with the necessary flexibility and may significantly increase the cost of child care for low-income families.
Instead, I will direct the Department to implement a child care program that supports the goals of the WorkFirst program to make work pay. The monthly co-pay required shall be a minimum of ten dollars for families at or below seventy-four percent of the federal poverty level adjusted for family size. For families with incomes above seventy-four percent of the federal poverty level adjusted for family size, the monthly co-pay shall be a minimum of twenty dollars or forty-seven percent of the family's income above one hundred percent of the federal poverty level adjusted for family size. Child care assistance shall not be provided to families with incomes above one hundred seventy-five percent of the federal poverty level adjusted for family size. As the program develops, we will continue to evaluate the success of this child care schedule in making work pay while holding costs within the appropriation level for the Workfirst program.
See Laws of 1997, ch. 454, at 2985.
As with the Governor's previous vetoes of copayment provisions, the Legislature took no action to override this veto. Instead, on October 17, 1997, the Legislature filed a Petition Against State Officers and Writs of Mandamus in this Court seeking a ruling *358 that Governor Locke's veto of a portion of § 204(6) was invalid and two other vetoes affecting the Department of Ecology (DOE) and the Office of Financial Management (OFM), while valid, resulted in a reduction in the amounts appropriated to those agencies. We declined to exercise original jurisdiction and transferred the case to the Thurston County Superior Court. The trial court, the Honorable Richard Hicks, entered an order preliminarily enjoining the Governor from disbursing or expending any funds appropriated in the DOE and OFM provisions, and granted the Legislature's motion for summary judgment as to all three vetoed provisions. The Governor has appealed only that portion of the ruling which held invalid his veto of (a), (b), and (c) of Laws of 1997, ch. 454, § 204(6).

ANALYSIS
We are asked once again to referee a dispute between the Legislature and the Governor regarding the parameters of the Governor's veto power under art. III, § 12 (amend.62). We begin by reiterating our constitutional mandate:
The Supreme Court must not abdicate its constitutional duty to act as an impartial referee of constitutional disputes between the legislative and executive branches of government in cases involving the gubernatorial veto. We should be steadfast in exerting a limited, and cautiously exercised, judicial responsibility with respect to the veto power to make sure neither the Legislature nor the Governor takes unfair advantage, and the balance our constitution envisions endures.
Lowry, 131 Wash.2d at 330-31, 931 P.2d 885.[3]
As in Lowry, resolution of this dispute requires examination of the actions of both the Legislature and the Governor. Both parties build their various arguments on Lowry and, indeed, that case controls disposition of this controversy.
A. The Governor's Veto Authority
In Lowry, we examined the scope of the Governor's veto authority, opining:
The Washington Constitution confers upon the Governor general veto authority over legislation and a distinct veto power over "appropriation items":
If any bill presented to the governor contain several sections or appropriation items, he may object to one or more sections or appropriation items ... Provided, That he may not object to less than an entire section, except that if the section contain one or more appropriation items he may object to any such appropriation item or items.
WASH. CONST. art. III, § 12 (amend.62). Under the general veto power, the Governor may veto a whole bill or a section of a bill. Additionally, the Governor's constitutional veto power, traditionally described as the line item veto power, also extends to "appropriation items."
Lowry, 131 Wash.2d at 315-16, 931 P.2d 885.
Lowry defines appropriations items subject to the Governor's line item veto as "language conditioning how an agency may spend an appropriation[,]" id. at 314, 931 P.2d 885, and further divides this category into two subsets of budget provisos"dollar provisos" and "nondollar provisos"defining each as follows:
"Dollar provisos" are subsections of appropriations bills conditioning the appropriation to an agency on compliance with legislative direction that certain funds be spent or not be spent, or the agency take or not take certain action....
The second type, "nondollar provisos," makes no reference to a specific dollar amount.
Id. at 314, 931 P.2d 885. We went on to clarify the scope of the Governor's veto authority as to such items holding:
any budget proviso with a fiscal purpose contained in an omnibus appropriations bill is an "appropriations item" under article III, section 12. Thus, so long as the Legislature *359 drafts budget bills as lump sum appropriations to agencies conditioned by provisos as we have defined them here, the Governor's appropriations item veto power extends to each such proviso.
Id. at 323, 931 P.2d 885.
However, we also expressed concern in Lowry about a governor exercising this line item veto authority in such a manner as to improperly intrude upon the Legislature's constitutional budgetary prerogatives. While the Governor was at liberty to define an appropriations item without regard to the language of the legislation, we cautioned:
The budget provisos to which the Governor's line item veto extends include full provisos to an appropriations bill, that is, full subsections of the section of an appropriations bill. We do not believe an "appropriations item" may be a sentence, phrase, letter, digit, or anything less than the whole proviso.
Id. at 323 n. 8, 931 P.2d 885.
Ultimately, the touchstone for our analysis in Lowry was our desire to preserve the proper constitutional balance between the legislative and executive branches:
Our constitution condones neither artful legislative drafting nor crafty gubernatorial vetoes....
....
... Our rare and reluctant involvement will be to ensure that neither the Legislature nor the Governor will so conduct its affairsthe Legislature in bill drafting and the Governor in exercising the veto that the coordinate branch of government is substantially deprived of the fair opportunity to exercise its constitutional prerogatives as to legislation.
Lowry, 131 Wash.2d at 320-21, 931 P.2d 885.
The Legislature asserts the Governor's veto is void because subsection (6) of § 204 is one integrated whole in form and substance. It argues "because the Legislature placed the paragraphs at issue here within a single subsection and the paragraphs are formally interrelated and specifically cross-referenced, the Governor cannot pick and choose among them, but must accept or reject the entire subsection." Br. of Resp't at 13. As to its "form" argument, the Legislature appears to be relying on Lowry, 131 Wash.2d at 323 n. 8, 931 P.2d 885, which notes the Governor's line item veto extends to "full subsections" and "whole provisos."
The Legislature further attempts to buttress its position that (6) is a single subsection by attempting to characterize the co-payment schedules in (a), (b) and (c) as necessary conditions for determining the amount of appropriation, thus making these copayment formulae mere elements of a single "dollar proviso" which must be accepted or rejected by the Governor in its entirety. Br. of Resp't at 19.
"[T]he co-payment schedule ... denominates the amount of money necessary to fund the child care program from each of two sourcesthe state and the citizens using the program. The level of the latter directly determines the size of the appropriation, and the contingent co-payment schedule provides a fiscal safety valve if higher than projected caseloads threaten to exhaust the entire appropriation."
Br. of Resp't at 17.
Governor Locke asserts his veto of portions (a), (b) and (c) of § 204(6) is valid because they are nondollar provisos under Lowry. He argues this is so because (a), (b) and (c) establish discrete conditions on appropriations to DSHS which "require poor families, requiring child care assistance in order to participate in certain welfare reform programs and thus, to continue to receive welfare benefits, to pay designated amounts toward child care." Br. of Appellant at 11 (emphasis added).
It is not surprising there are correct and incorrect elements to the arguments of both the Legislature and the Governor here. First, Lowry held "any budget proviso with a fiscal purpose contained in an omnibus appropriations bill is an `appropriations item' under article III, section 12 ... [and that] the Governor's appropriations item veto power extends to each such proviso." Lowry, 131 Wash.2d at 323, 931 P.2d 885. The Governor correctly argues that if the copayment schedules at issue here are nondollar *360 provisos, as such they are indeed subject to the Governor's veto pen under Lowry.
However, in analyzing whether an appropriations item is present in this case, we disagree with the Legislature's assertion that its placement of language in § 204(6) is conclusive on the issue of what constitutes an appropriations item. Although we generally defer to the Legislature as to its divisions within legislation, such deference is not absolute:
The Legislature's designation of a section is conclusive unless it is obviously designed to circumvent the Governor's veto power and is "a palpable attempt at dissimulation." But where, as here, we discern legislative drafting that so alters the natural sequences and divisions of a bill to circumvent the Governor's veto power, we reserve the right to strike down such maneuvers.
Lowry, 131 Wash.2d at 320-21, 931 P.2d 885 (emphasis added) (citation omitted). Given the prior history of the copayment provision appearing in a separate section of a piece of substantive legislation, the Welfare Reform Act, and the Legislature's interweaving of such provision into two operating budget bills with distinctively different consequencesas a dollar proviso in chapter 149 and a nondollar proviso in chapter 454[4]this section raises the specter of circumvention sufficiently to disregard deferring to the Legislature's designation of (6) as a single and complete "subsection," incapable of division.
Moreover, the practical impact of the copayment schedules lends credence to this determination. While application of the copayment schedules may help to preserve the amount of the funds appropriated, the copayment schedules do not determine the size of the initial appropriation. Lowry indicates dollar provisos reference specific amounts. See Lowry, 131 Wash.2d at 314, 931 P.2d 885. Here, nothing in the language of the copayment schedule addresses the sum certain appropriated in the first sentence of (6), which is the only true dollar proviso in all of (6). At best, the copayment language is only tangentially related to the $73 million appropriation, as it establishes criteria poor families must meet in order to receive disbursements from DSHS out of the appropriated sum designated in the first sentence of (6) for child care. It does not reference the specific dollar amount appropriated, nor is it a determinative condition of the initially appropriated amount, it does not define agency action which must be undertaken as a condition of the agency's receipt of the initial appropriation. Thus, these copayment schedules (i.e., conditions on families who will seek funds from DSHS) do not constitute a dollar proviso as defined in Lowry.
Section 204(6) of the 1997 operating budget, containing the copayment schedules, is not a single dollar proviso which must be accepted or rejected by the Governor in its entirety. Instead, we hold § 204(6) contains two distinct provisos. The first, a dollar proviso, conditions the use of the $73 million appropriation by DSHS "solely for child care assistance for low-income families" participating in designated welfare reform programs created by the Act. The second, a nondollar proviso, requires the establishment of a copayment schedule and sets forth the elements of such a schedule.
Although the Governor has the constitutional authority to veto an appropriations item such as the nondollar proviso contained in § 204(6), we agree with the Legislature the veto power is not unfettered. Lowry directs that the Governor's line item veto power is limited to "whole provisos." See Lowry, 131 Wash.2d at 323 n. 8, 931 P.2d 885 (quoted above). The issue then becomes what is a whole proviso? Lowry`s footnote 8, although commenting on the issue, does not adequately answer the question as designating a "full subsection" can be too easily manipulated by the mere placement of a number or letter, or artificial division into paragraphs. The answer is suggested by our discussion in Lowry of the Laws of 1994, 1st Spec. Sess., ch. 6, § 610(5)(a), where we recognized *361 and discussed the effect of a proviso within a proviso as follows:
[I]n LAWS OF 1994, 1st Spec. Sess., ch. 6, § 610(5)(a), the Legislature conditioned an appropriation to the Higher Education Coordinating Board for financial aid and grant programs as follows:
$95,039,000 is provided solely for the state need grant program. Of this amount, a maximum of $249,000 may be expended to establish postsecondary education resources centers through the early intervention scholarship program to the extent that an equal amount of federal matching funds are also provided. The board shall, to the best of its ability, rank and serve students eligible for the state need grant and the early intervention scholarship program in order from the lowest family income to the highest family income.
The Legislature conditioned the appropriation to the Higher Education Coordinating Board on a maximum dollar figure that could be expended by the Board. If the Governor vetoes this proviso language, as Governor Lowry did, the overall appropriation to the agency ought not be reduced by a sum of $249,000 because it is unclear how much of the $249,000 might be expended by the Board in the biennium for the referenced purpose. The Board may spend nothing or up to $249,000. The Legislature limited the amount that could be used for this purpose. When the Governor vetoes such a subsection in an appropriations bill, the veto does not automatically reduce the appropriation to the agency by a sum certain because the proposed expenditure is not for a sum certain, although the agency may not exceed the specified legislative cap on spending.
Lowry, 131 Wash.2d at 324-25, 931 P.2d 885 (some emphasis added) (footnote omitted). We clearly referred to the language within § 610(5)(a) referencing the $249,000 contingency as "this proviso language" and as a "subsection."[5] Thus, under Lowry, the Governor's line item veto power extends to whole provisos, but the parameters of such provisos are not necessarily determined by artificial divisions by number or letter; rather, an examination of the language in question and the operative effect of such language indicates the nature of the proviso.
The language of § 204(6) reveals Governor Locke did not veto the whole proviso relating to child care copayments. Paragraphs (a), (b) and (c) of (6) clearly contain formulae for determining various copayment amounts; but the last sentence of (6) contains the language requiring copayments. Thus, because the last sentence of (6), and (a), (b) and (c) all address copayments and naturally fit together, the former requiring copayment and the latter setting copayment amounts, they together make a single, whole copayment proviso.
Governor Locke's theory is that in vetoing (a), (b) and (c), he excised discrete conditions requiring welfare reform program families to pay designated amounts toward child care. By failing to include the last sentence in (6) in his veto, he neglected to include that portion of the copay proviso requiring copayments. Therefore, because the Governor failed to veto the "whole proviso," as defined by the operative effect of that proviso's language, such partial veto is invalid. Lowry, 131 Wash.2d at 323-25, 931 P.2d 885. Our analysis in this case, however, does not end with this determination.
B. The Child Care Copayment Proviso as Substantive Law
In the event we determine his veto to be invalid, the Governor also argues paragraphs (a), (b), (c) of § 204(6) are invalid as substantive law contained within an omnibus appropriations bill. The Governor's argument is correct, as far as it goes. As we previously noted, the last sentence of § 204(6) must be read together with subparagraphs (a), (b), and (c). Indeed, as we stated in Lowry, legislative attempts at weaving substantive policy provisions into omnibus appropriations or operating budget bills may be constitutionally infirm:

*362 When the Legislature places a proviso in an appropriations section not containing a specific dollar amount, it may do so at the peril of having the proviso invalidated. Such a proviso often has all the characteristics of substantive legislation. We have repeatedly indicated the Legislature may not abolish or adopt substantive law in an appropriations bill.
Lowry, 131 Wash.2d at 328 n. 11, 931 P.2d 885 (citations omitted).
In numerous prior decisions, we have construed art. II, § 19 to forbid inclusion of substantive law in appropriations bills. WASH. CONST. art. II, § 19 states:
No bill shall embrace more than one subject, and that shall be expressed in the title.
Such an action violates the constitutional directive of art. II, § 19 because a budget bill, by its nature, appropriates funds for a finite time periodtwo yearswhile substantive law establishes public policy on a more durable basis. In effect, a budget appropriates the funds necessary to implement general laws. In State ex rel. Washington Toll Bridge Auth. v. Yelle, 54 Wash.2d 545, 342 P.2d 588 (1959), we explained:
"An appropriation bill is not a law in its ordinary sense. It is not a rule of action. It has no moral or divine sanction. It defines no rights and punishes no wrongs. It is purely lex scripta. It is a means only to the enforcement of law, the maintenance of good order, and the life of the state government. Such bills pertain only to the administrative functions of government...."
Appropriation bills are made temporary in nature by the provisions of Art. VIII, § 4 (amendment 11), which require that all expenditures of moneys appropriated be made within one calendar month after the end of the fiscal biennium.
It follows that, if legislation of a general and continuing nature is to be passed, it cannot come under the subject of appropriations ...
Yelle, 54 Wash.2d at 551, 342 P.2d 588 (citation omitted).
Moreover, by their omnibus nature, budget bills offer too tempting a target for legislative logrolling, which art. II, § 19 forbids. Issues that failed on their merits may not be resurrected by their inclusion in an operating budget bill.[6] Policy legislation must pass or fail on its own merits, taking the normal course of a bill. As we said in Flanders v. Morris, 88 Wash.2d 183, 188, 558 P.2d 769 (1977):
[An appropriations bill] cannot add restrictions to public assistance eligibility and still be said to define no rights. The proper legislative procedure is to enact separate, independent, properly titled legislation.
Similarly, in Service Employees Int'l Union, Local 6 v. Superintendent of Public Instruction, 104 Wash.2d 344, 705 P.2d 776 (1985), we stated:
Article 2, section 19 of our state constitution has a dual purpose: (1) to prevent "logrolling", or pushing legislation through by attaching it to other necessary or desirable legislation, and (2) to assure that the members of the legislature and the public are generally aware of what is contained in proposed new laws.

*363 Thus, when an appropriations act defines rights or amends existing laws, the act violates article 2, section 19.
Id. at 351, 705 P.2d 776 (emphasis added) (citation omitted).
When we speak of "substantive law," we have indicated in prior case law what constitutes substantive law that may not be included in a budget bill. See, e.g., Power, Inc. v. Huntley, 39 Wash.2d 191, 235 P.2d 173 (corporate income tax in budget bill); State ex rel. Washington Toll Bridge Auth., 54 Wash.2d 545, 342 P.2d 588 (revenue bonds in supplemental budget bill); Flanders, 88 Wash.2d 183, 558 P.2d 769 (additional limitations on eligibility for public assistance beyond existing statutory criteria set forth in supplemental budget). We decline to adopt a categorical definition of "substantive law," but where the policy set forth in the budget has been treated in a separate substantive bill, its duration extends beyond the two year time period of the budget, or the policy defines rights or eligibility for services, such factors may certainly indicate substantive law is present. These are not the exclusive factors defining substantive law, however.
In the present case, the copayment policy appears to have a life of its own. It first appeared in similar form in the welfare reform legislation, of which it was a part, and had no designated expiration date. The policy was of continuing nature, defining eligibility for public assistance. Laws of 1997, ch. 58, § 402. Thus, the Legislature considered and treated copayments in substantive legislation.
Aside from their copayments' apparent longevity, the copayment proviso, set forth in the last sentence of § 204(6) and paragraphs (a), (b) and (c), is substantive law because it adds restrictions to public assistance eligibility. Under the Legislature's WorkFirst welfare program, adults are required to participate in work programs to receive public assistance benefits for themselves and their families. See Laws of 1997, ch. 58, § 313. For those families requiring child care assistance to participate in work programs, the last sentence of § 204(6) and paragraphs (a), (b) and (c) establish the amounts such poor families must pay to receive child care assistance and thus, to remain eligible for public assistance. It hardly may be argued these provisions lack the effect of substantive law on the affected public assistance recipients.
As the intent and effect of the copayment provision here is to restrict access to public assistance eligibility, its inclusion by the Legislature in a budget bill violates art. II, § 19. Flanders, 88 Wash.2d at 188, 558 P.2d 769. We hold the entire copayment proviso, that is, the last sentence of (6) and subparts (a), (b) and (c) inclusive, invalid.

CONCLUSION
It is clear both the Governor and the Legislature wanted families participating in the WorkFirst program to make copayments for assisted child care. It is equally clear they did not agree on the correct copayment amounts to be paid. This is an issue of substantive law which must be worked out through the legislative process.
The Governor's veto of paragraphs (a)(c) of § 204(6) was ineffective insofar as it was only a partial veto of an appropriations item. That portion of § 204(6) relating to child care copayments, however, was unconstitutional under art. II, § 19 as substantive law in an operating budget bill. We reverse the trial court's judgment and remand the case to the trial court for further proceedings consistent with this opinion.
SMITH, JOHNSON, ALEXANDER, IRELAND, JJ., and WEBSTER, J.P.T., concur.
SANDERS, J., concurs in result only.
MADSEN, J. (concurring).
I join the majority in its result of reversing the trial court's judgment in favor of the Legislature in this case. However, I do so for different reasons. I would uphold the Governor's veto of the three lettered provisions of Laws of 1997, ch. 454, § 204(6). Unlike the majority, I would not fault the Governor for complying with our guidance in Washington State Legislature v. Lowry, 131 Wash.2d 309, 931 P.2d 885 (1997), in his act *364 of vetoing these provisions. Accordingly, I would not reach the question of whether the Legislature's inclusion of the provisions within an appropriations bill was in violation of Const. art. II, § 19.
Under Const. art. III, § 12 (amend 62), the Governor may veto "less than an entire section ... if the section contain one or more appropriation items" by vetoing "any such appropriation item or items." The majority concedes that "appropriations items subject to the Governor's line item veto" consist of "`language conditioning how an agency may spend an appropriation.'" Majority at 358 (quoting Lowry, 131 Wash.2d at 314, 931 P.2d 885). Furthermore, the majority acknowledges that such language is to be found in the three vetoed provisions. In Lowry, we had noted that "[b]ecause the purpose of the Governor's `line item' veto is to excise line items in appropriations bills, we should give effect to such a purpose." Id. at 323, 931 P.2d 885 (emphasis added). However, rather than giving effect to that purpose, the majority makes much of a footnote in Lowry, which provides that "[t]he budget provisos to which the Governor's line item veto extends include ... full subsections of the section of an appropriations bill. We do not believe an `appropriations item' may be a sentence, phrase, letter, digit, or anything less than the whole proviso." Id. at 323 n. 8, 931 P.2d 885. Accordingly, the majority finds that the Governor failed to properly exercise his veto here because the vetoed portion of § 204(6) was unseverable, "as defined by the operative effect of that proviso's language," from a line that was left intact. Majority at 361. Thus, the Governor failed to veto the "`whole proviso.'" Majority at 361.
I disagree. I would allow the Governor to rely upon the guidance of the plain meaning of the words that we used in Lowry, where we said that he may not veto less than "full subsections" or a "full proviso." See Lowry, 131 Wash.2d at 323 n. 8, 931 P.2d 885. A "subsection" is simply "a subdivision or a subordinate division of a section." Webster's Third New International Dictionary 2278 (1993). Similarly, a "proviso" is "a conditional stipulation." Id. at 1827. I believe that the three lettered paragraphs of § 204(6) containing formula for determining various copayment amounts were, in fact, properly vetoed subsections or provisos severable from the sentence in § 204(6) that simply required copayments. See Laws of 1997, ch. 454, § 204(6) ("All child care assistance provided shall be subject to a monthly copay to be paid by the family receiving the assistance."). I fail to discern why a copayment schedule necessarily had to be included in the language of § 204(6) itself if the undenominated requirement for copayments were to solely be left intact. That requirement was left with "operative effect," as demonstrated by the Governor's directive to the Department of Social and Health Services to promulgate copayment regulations. See Laws of 1997, ch. 454, at 2985. Essentially, the majority chides the Governor for leaving intact a requirement that he gave full effect to instead of vetoing it and, as would then be his prerogative under the majority's position, resurrecting it wholly in the form of an administrative rule.
We said in Lowry that we would only "rarely, and reluctantly," referee these types of disputes between our coordinate branches of government. Lowry, 131 Wash.2d at 320, 931 P.2d 885. Unfortunately, however, our involvement in these cases seems to have become more regular, perhaps as our eagerness to legislate grows. Evidence of this evolution can be found in this case. Under Lowry, we defer to "[t]he Legislature's designation of a section ... unless it is obviously designed to circumvent the Governor's veto power and is `a palpable attempt at dissimulation.'" Lowry, 131 Wash.2d at 320, 931 P.2d 885 (quoting State ex rel. Hamilton v. Martin, 173 Wash. 249, 257, 23 P.2d 1 (1933)). The majority finds that such dissimulation occurred here.
While I agree with that determination, in concluding that the Governor's veto was properly exercised I cannot agree with what surprisingly then follows: the majority's reconfiguration of what it perceived to be a proviso subject to veto. Just as troubling as the prospect of the Governor vetoing "a sentence, phrase, letter, digit, or anything less than the whole proviso[,]" Lowry, 131 Wash.2d at 323 n. 8, 931 P.2d 885, is a *365 majority of this court shifting those same bill components around like pieces of a jigsaw puzzle to constitute what are, in their estimation, provisos. After all, we must "avoid impinging upon the core functions of coordinate constitutional branches of government." Philip A. Talmadge, Understanding the Limits of Power: Judicial Restraint in General Jurisdiction Court Systems, 22 Seattle U.L.Rev. 695, 737 (1999). Yet this is a case where this court, quite novelly, declares that only we, not the parties in this case  the Legislature and the Governor  who are only two players in the legislative process, are capable of discerning the correct answer in a dispute arising out of that process.
I am concerned that the result of the majority's analysis, coupled with its writing that "provisos are not necessarily determined by artificial divisions by number or letter; rather, an examination of the language in question and the operative effect of such language indicates the nature of the proviso[,]" Majority at 361, will be to ensure this court's future, and open-ended, intervention in the legislative process  thus "requiring us to substitute our judgment, without the benefit of committee hearings and public testimony, for that of the people's elected legislative representatives and the Governor." CLEAN v. State, 130 Wash.2d 782, 815, 928 P.2d 1054 (1996) (Talmadge, J., concurring).
In this case, the Governor notes that "[t]he Legislature did not pursue the constitutional remedy available to it  override of the veto." Br. of Appellants at 24. Indeed, it could be argued that "under proper principles of exhaustion, the litigants ... should have first resorted to available political remedies by seeking an override of the governor's veto." Talmadge, 22 Seattle U.L. Rev. at 735. As we observed in Lowry: "Though the Legislature has reluctantly exercised this power to override a veto in the past, we should be loathe to limit the Governor's line item veto power when this constitutional remedy is available to the Legislature." Lowry, 131 Wash.2d at 331, 931 P.2d 885. Where, after all, is the incentive to let the legislative process run its course in resolving a dispute between the Legislature and the Governor if the Washington Supreme Court can always be counted upon to come to the rescue?
Here the majority second-guesses the Governor only to redeem the effect of his invalidated veto, in a jurisprudential tour de force, by second-guessing the Legislature. This case could further embolden those involved in the legislative process to yield hard policy choices to the judiciary. Simply put, "many issues are better left to the more political branches of government to decide. Where the courts become embroiled in political controversies, the legitimacy of the courts, their aura of impartiality and independence, are apt to suffer as each new political issue has its day in the sun." Talmadge, 22 Seattle U.L. Rev. at 739.
NOTES
[1] *NEW SECTION. Sec. 402. CHILD CARE. (1) Within available funds, the department shall administer a single, integrated child care program which may serve families with incomes up to one hundred seventy-five percent of the federal poverty level.

(2) All families participating in the child care program shall have equal access to the child care of their choice. However, the child care providers must comply with applicable licensing rules if they are required by law to comply with those rules.
(3) The minimum copayment per family shall be at least ten dollars per month. Child care shall be provided on a sliding scale but may not be provided for any family whose income equals or exceeds one hundred seventy-five percent of the federal poverty level adjusted for family size on an annual income basis. For families with income between seventy-four and one hundred percent of the federal poverty level adjusted for family size, the monthly child care copayment shall be thirty percent of earned income in excess of seventy-four percent of federal poverty level adjusted for family size. For families with income at or above one hundred percent of the federal poverty level adjusted for family size, the copay shall be a minimum of one hundred dollars per month. For families with income between one hundred one and one hundred thirty percent of the federal poverty level adjusted for family size, the monthly copay shall be twenty-nine percent of earned income in excess of seventy-four percent of the federal poverty level adjusted for family size. For families with income between one hundred thirty-one and one hundred seventy-five percent of the federal poverty level adjusted for family size, the copay shall be fifty percent of earned income above one hundred percent of the federal poverty level adjusted for family size.
(4) All compensable child care services authorized in this section shall be paid for through vouchers. Vouchers shall be provided to recipients and may only be used to purchase a child care through the program created in this section.
[2] While the Governor proposed a copayment schedule very similar to the one he vetoed, he did not propose a contingent copay plan. The Legislature's contingent formulato be applied in the event of a waitlist for child care assistance or in the event child care expenditures exceed the appropriation is excluded from the Governor's schedule.
[3] See also Lowry, 131 Wash.2d at 332, 931 P.2d 885 ("Neither the Legislature nor the Governor should be able to circumvent the constitution by manipulating what constitutes a section or what is subject to the appropriation item veto.") (Madsen, J., concurrence/dissent).
[4] Cf. Laws of 1997, ch. 149, § 207(6) (making the appropriation of $73,129,000 to DSHS contingent upon the enactment of Laws of 1997, ch. 58, § 402, which required copayments from low income families receiving child care subsidies); Laws of 1997, ch. 454, § 204(6)(a)(c) (describing copayment schedules).
[5] Governor Lowry's veto message clearly refers to language addressing the $249,000 for resource centers as the "proviso" contained within section 610(5)(a). See the Laws of 1994, 1st Spec. Sess., ch. 6, at 2196.
[6] An operating budget bill is essentially a compulsory outcome of any legislative session. This again makes the budget a convenient target for legislative trading, a legislator could say:

"I'll vote for the budget if you revive my bill as a proviso to the appropriation for agency X."
In Power, Inc. v. Huntley, 39 Wash.2d 191, 235 P.2d 173 (1951), we specifically condemned such horse trading, stating:
We have here a situation in which neither the appropriation bill, §§ 1 and 2, nor the corporation income tax bill, §§ 3 to 44, standing on its own merits, could pass the legislature in the special session, but when the proponents of these measures combined their interests, both were enacted into Laws of 1951, Ex. Ses., chapter 10. (Whether or not the corporation income tax is unconstitutional for some other reason is not material to our consideration of whether chapter 10, taken as a whole, violates Art. II, § 19, of the constitution.) This is the clearest possible illustration of the kind of "logrolling," the "you-scratch-my-back-and-I'll-scratch-yours" situation that the constitutional provision was designed to prevent.
Id. at 198-99, 235 P.2d 173.