119 P.3d 341 (2005)
Jason BROWN, a Washington State voter, taxpayer, and a Federal Way School District teacher; Rebecca Fife, a Washington State voter, taxpayer, and a Federal Way School District teacher, Margo Campbell, a Washington State voter, taxpayer, and an Issaquah School District teacher; Suzanne Saylor, a Washington State voter, taxpayer, and an Issaquah School District teacher; Jim Gow, a Washington State voter, taxpayer, and a Lake Stevens School District teacher; Sheerie Slatton, a Washington State voter, taxpayer, and a Kettle Falls School District teacher; Mike Hymes, a Washington State voter, taxpayer, and a Moses Lake School District teacher; Steve Lindholm, a Washington State voter, taxpayer, and a Moses Lake School District teacher; Karle Warren, a Washington State voter, taxpayer, and a Clarkston School District teacher; and Washington Education Association, a Washington non-profit corporation, Respondents,
v.
STATE of Washington, Appellant,
Federal Way School District No. 210, a Washington State Public School District; Issaquah School District No. 411, a Washington State Public School District; Lake Stevens School District No. 4, a Washington State Public School District; Kettle Falls School District No. 212, a Washington State Public School District; Moses Lake School District No 161, a Washington State Public School District; and Clarkston School District No. 250, a Washington State Public School District, Interested Parties.
No. 75878-6.
Supreme Court of Washington, En Banc.
Argued June 28, 2005.
Decided September 8, 2005.
*342 David Alan Stolier, Olympia, for State of Washington.
Thomas Fitzgerald Ahearne, Alice M. Ostdiek, Ramsey E. Ramerman, Foster Pepper & Shefelman PLLC, Seattle, for Jason Brown, et al.
Rockie Ulrich Hansen, Rockie Hansen PLLC, Spokane, for Other Parties Clarkson School Dist. No. 250 and Kettle Falls School Dist. No. 212.
Lester Porter, Lance M. Andree, Dionne & Rorick, Seattle, for Other Party Federal Way School District No. 210, et al.
Christopher Lee Hirst, Philip Mosby Guess, Preston Gates & Ellis LLP, Seattle, for Other Party Issaquah School Dist. No. 411.
Michael W. Hoge, Perkins Coie, Seattle, for Other Party Lake Stevens School Dist. No. 4.
Craig Hanson, Hanson Law Offices, Olympia, for Other Party Moses Lake School Dist. No. 161.
CHAMBERS, J.
¶ 1 For many years, the legislature funded up to three optional learning improvement days for local school districts. After passage of Initiative 732 and in the wake of strained budgets, the legislature decided to fund a maximum of two learning improvement days for the 2002-03 school year.
¶ 2 We are asked to hold that this change was a violation of the State's paramount duty to provide for a general and uniform system of education. Const. art IX, §§ 1-2. Alternatively, we are asked to hold it effectively resulted in a cost of living increase lower than required by Initiative 732.
¶ 3 We conclude that learning improvement days are optional and are not necessarily a component of the basic education the State is obliged to provide to all children. Thus this change has not been shown to violate our constitution. We also hold that the legislature did not indirectly violate Initiative 732 when it eliminated one optional learning improvement day. Accordingly, we reverse the trial court.

*343 I
¶ 4 We begin with first principles:
It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex.
The legislature shall provide for a general and uniform system of public schools.
CONST. art. IX, §§ 1-2. This constitutional provision is substantive and enforceable. See generally Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71 (1978). Almost 30 years ago, courts in this state reluctantly concluded that the legislature had not provided a general and uniform system of public schools as required by the constitution, because school funding largely relied on local levies which often failed rather than regular and dependable tax sources. Id. However, out of our respect for the constitution's delegation of responsibility and authority to the legislature to provide education, this court declined to impose specific substantive requirements at that time, leaving that task to the legislature. Id. at 518-19, 585 P.2d 71.
¶ 5 The legislature has chosen to discharge its responsibility to provide a general and uniform system of education through The Washington Basic Education Act of 1977 (Basic Education Act), RCW 28A.150.200 through .510. The Basic Education Act, among other things, requires school districts to offer certain minimum hours of instruction and mandates certain staffing ratios. RCW 28A.150.220, .260.
¶ 6 The State pays the base salaries of all teachers and staff it requires school districts to employ for all 180 instructional days that it deems necessary to provide a basic education. E.g., LAWS OF 2002, ch. 371, § 503(7). The Basic Education Act itself does not set forth salaries; the salary structure is set forth elsewhere in the title. See RCW 28A.400.200. The act does set out minimum staffing ratios[1] which are statutorily designated as constitutionally required. RCW 28A.150.260. The amount that the State pays for teachers and staff it requires school districts to hire for the 180 day instructional year is called the "derived base salary," and is calculated according to schedules put forth in appropriation bills and an administrative document called the "LEAP 1S," with some exceptions not relevant here. See, e.g., LAWS OF 2001, 2d Spec. Sess., ch. 7, § 503.
¶ 7 The 1993 legislature authorized districts to assign non-instructional "learning improvement days." LAWS OF 1993, ch. 336, § 301; see also RCW 28A.655.130. On these days, teachers would receive additional training, among other things. RCW 28A.655.130(1). The decision to provide learning improvement days came out of a review of public education by the governor's counsel on education reform and funding in the early 1990s. During the pilot program stage, the legislature allowed school districts to apply for grants to fund these days. School districts were not required to take advantage of the program and the statute authorizing the pilot program explicitly said that it was not part of basic education. See LAWS OF 1993, ch. 336 § 301(8).
¶ 8 Whether or not to hold learning improvement days is and always has been at the discretion of the local school district, and school districts are not required to use as many as the legislature authorizes. RCW 28A.655.130. It appears the vast majority of school districts take advantage of this program. Now that the program has been made permanent, if districts elect to hold such days, then the State increases the amount of salary funds it makes available to the district according to a strict schedule. E.g., LAWS OF 2002, ch. 371, § 503(7). Specifically, the State supplements the salary allocation by 1/180th of the derived base salary for every learning improvement day the school district holds, producing a new total *344 base salary allocation. Id. "Total base salary" and "derived base salary" are terms of art.
¶ 9 In November 2000, the people overwhelmingly adopted Initiative 732, which mandated that the State provide an annual cost-of-living increase for all teachers and school employees so their salaries could at least keep up with inflation. The amount of the raise was to be recalculated every year and based on the annual average consumer price index. RCW 28A.400.205(2).
¶ 10 In 2002, this state faced a significant budget deficit. The legislature elected to balance the budget by reducing, among other things, the number of learning improvement days from three to two. See LAWS OF 2002, ch. 371, § 503(7) (ESSB 6387). That same year, for the first time since the pilot program days (in an uncodified appropriation bill), the legislature said explicitly that learning improvement days "shall not be considered part of basic education." LAWS OF 2002, ch. 371, § 503(7).
¶ 11 For those school districts consistently electing to hold the maximum number of learning improvement days, that effectively meant instead of a 2002/03 salary based on a 183 day work year with a 3.6 percent cost of living adjustment, employees were compensated for a 182 day work year with a 3.6 percent cost of living adjustment. For many employees, it effectively meant the loss of one day's pay, representing about one-half of one percent reduction in pay in comparison to what they would have received had the legislature kept to tradition and authorized three learning improvement days.
¶ 12 A coalition of school districts, teachers, and private citizens did not think that the effective one day reduction in pay was right and sued. Plaintiffs include lead plaintiff, Federal Way first grade teacher Jason Brown. Collectively, we will refer to the challengers as Brown. Brown asserts that this reduction in the number of learning improvement days was improper for two reasons. He contends that learning improvement days had become part of constitutionally required basic education, and that the legislature lacks the power to reduce anything deemed basic education without an established educational reason to do so. He also argues that the change indirectly violated Initiative 732, on the theory that it worked a reduction in the cost-of-living adjustment.
¶ 13 Both sides moved for summary judgment. After concluding that the term "salary base" in Initiative 732 is ambiguous, the trial court ruled that the average informed voter would have believed the phrase in the initiative, "state-funded salary base used in state funding formulas for teachers and other school district employees," I-732 § 2(1)(a), in context referred to the actual wages received in the prior year, not the current derived base salary. The trial court thus concluded that education workers must receive a cost-of-living increase equivalent to the federal cost-of-living index over last year's total received compensation. The trial court found it unnecessary to reach the constitutional claim. Both parties sought direct review, which we granted.

II
¶ 14 We review the meaning of the constitution and statutes de novo. State v. Heckel, 143 Wash.2d 824, 831-32, 24 P.3d 404 (2001); W. Telepage, Inc. v. City of Tacoma Dep't of Fin., 140 Wash.2d 599, 607, 998 P.2d 884 (2000).

A. BASIC EDUCATION AND APPROPRIATION STATUTES
¶ 15 First we note that the parties may frame the issues they bring as they wish. However, the way parties present their arguments cannot alter the meaning of statutes or of the constitution. In the case before us, both parties appear to assume that anything within the Basic Education Act is constitutionally required within the meaning of the State's "paramount duty" to provide "a general and uniform" system of education. But this court has never held, nor do we now hold, that the Basic Education Act defines the scope of the State's paramount constitutional duty to provide education. Nor has this court ever held, nor do we now hold, that what is not within the Basic Education Act is outside the State's paramount duty. This *345 court will not micromanage education and will give great deference to the acts of the legislature. See Seattle Sch. Dist., 90 Wash.2d at 518-19, 585 P.2d 71. However, it is uniquely within the province of this court to interpret this state's constitution and laws. Cf. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).
¶ 16 Brown first argues that the State effectively made three learning improvement days part of the Basic Education Act during the 1999 through 2003 school years, despite the fact that they are authorized in a different portion of the education title. Having once made three learning improvement days part of the Basic Education Act, Brown contends, the State has become duty bound to continue with the program until and unless it has an educational policy rationale for eliminating or reducing the program.[2] The State challenges Brown's contention that three learning improvement days ever implicitly became part of the requirements of the Basic Education Act. We will largely address the issues as framed by the parties, and thus begin with whether learning improvement days are implicitly part of the Basic Education Act.
¶ 17 We first look to the language of the original acts establishing learning improvement days. While the statute authorizing the pilot program specifically said it was not part of basic education, the codified statute in force at the time this case arose was silent on the point. Compare LAWS OF 1993, ch. 336, § 301 with RCW 28A.655.130. Notably, the statute authorizing learning improvement days does not appear in the Basic Education Act. LAWS OF 1993, ch. 336, § 301 (establishing program); LAWS OF 1999, ch. 388, § 402 (codified at RCW 28A.655.130); cf. RCW 28A.150.200-.510 (Basic Education Act).
¶ 18 As of 1999, the statute provides in relevant part:
(1) To the extent funds are appropriated, the office of the superintendent of public instruction annually shall allocate accountability implementation funds to school districts. The purposes of the funds are to: Develop and update student learning improvement plans; implement curriculum materials and instructional strategies; provide staff professional development to implement the selected curricula and instruction; develop and implement assessment strategies and training in assessment scoring; and fund other activities intended to improve student learning for all students, including students with diverse needs.
....
(3) The amount of allocations shall be determined in the omnibus appropriations act.
RCW 28A.655.130. While this statute does not provide for any particular number of learning improvement days, the 1999 legislature, in an appropriation bill, had authorized school districts to have up to three such days per year. LAWS OF 1999, ch. 309, § 503(7).

B. ROLE OF APPROPRIATION BILLS
¶ 19 We turn to Brown's argument that the legislature impliedly made learning improvement days part of basic education in appropriation bills setting salary schedules. Whether or not the legislature can bindingly designate specific programs to be part of basic education in the constitutional sense, Brown misunderstands the role of these appropriation bills. These bills set aside funds to pay for staff salaries, including funds to compensate those staff required by their districts to work up to three learning improvement days. See LAWS OF 2001, 2d Spec. Sess., ch. 7, § 503; (setting "basic education employee compensation," referring specific calculations to "LEAP Document 1S");[3] *346 LAWS OF 2000, 2d Spec. Sess., ch. 1, § 503 (same); LAWS OF 1999, ch. 309, § 503 (same). By themselves, appropriation bills do not amend the Basic Education Act.
¶ 20 Brown argues that the language of "Headers" on the appropriation bills is strong evidence that the number of learning improvement days rises to the level of constitutionally mandated basic education. The standardized header for this reoccurring budget item reads "FOR THE SUPERINTENDENT OF PUBLIC INSTRUCTION  BASIC EDUCATION EMPLOYEE COMPENSATION." id. (emphasis added).
¶ 21 But whether or not appropriation bill headers are a part of the law, a question we need not reach today, these headings do not establish that learning improvement days are part of basic education. The thrust of the heading is compensation, and it has been the standard language used in the heading since long before the introduction of learning improvement days. E.g., LAWS OF 1989, 1st Ex.Sess., ch 3 § 503; see also LAWS OF 1988, ch. 289, § 503 ("FOR THE SUPERINTENDENT OF PUBLIC INSTRUCTION  BASIC EDUCATION EMPLOYEE COMPENSATION") (emphasis added). We decline to hold that they are evidence of constitutional requirements.
¶ 22 Brown also contends that the explicit disclaimer that learning improvement days are not part of basic education in the 2002 appropriation bill is strong evidence that the days were part of basic education before that. LAWS OF 2002, ch. 371 § 503(7). But this disclaimer does not change prior law. Instead, it clarifies it. The legislature may clarify existing law, so long as it does not conflict with rulings of this court. See Overton v. Econ. Assistance Auth., 96 Wash.2d 552, 558, 637 P.2d 652 (1981). Since this court has not ruled on this matter, the legislature is free to clarify the law.
¶ 23 Even if we were to conclude that these appropriation bills amounted to an explicit legislative declaration that learning improvement days were a required part of basic education, appropriation bills tend not to be an appropriate place to create substantive law. State ex rel. Wash. Toll Bridge Auth. v. Yelle, 54 Wash.2d 545, 551, 342 P.2d 588 (1959). This is mostly because of the ever present danger of logrolling; requiring legislators to vote for a provision at the risk of losing funding for something else. Wash. State Legislature v. State, 139 Wash.2d 129, 146, 985 P.2d 353 (1999). It is also a consequence of their temporary, uncodified, nature.
¶ 24 Nowhere in any of these appropriation bills is there an explicit declaration that the legislature has found learning improvement days to be a part of basic education. We find the headers and the disclaimer in the appropriation bills insufficient to make this program part of basic education.

C. LEGISLATIVE HISTORY
¶ 25 Next Brown argues that legislative history establishes that the legislature intended three learning improvement days to be part of basic education. If a statute is not plain on its face, this court will turn to legislative history. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 12, 43 P.3d 4 (2002). While the parties seem to agree the relevant statutes at issue are plain, both have provided language out of legislative hearings they believe cast particular light on the issues.
¶ 26 These statutes do not appear to us to be ambiguous and we need not turn to legislative history. However, we note in passing that the legislative history supports the conclusion that learning improvement days have not yet been made part of basic education. As proposed, the bill specifically said that "funding under this section shall not become part of the state's basic program for education obligation as set forth under article 9 of the State's Constitution." Clerk's Papers (CP) at 2084 (emphasis added). Then-chair of the education committee, Senator Rosemary McAuliffe, moved to strike the phrase "not basic education" from the bill. This provoked the following conversation:

Senator Sellar: Just two questions, I guess. Number one, what does that do?.... [D]oes that cost a higher level of *347 funding? And number two, is it a constitutional amendment?

Staff: No, ... I would not say that it is a constitutional amendment. What this does is currently by saying this ... it cannot be argued that any of the dollars that are provided under this section are part of basic ed[ucation]. It is the state's constitutional duty to define and fully fund basic education and so this, if you use this sentence then ... supposedly it's a clear message to the courts that those dollars were never intended to be part of the State's constitutional paramount duty to provide and fully fund basic ed[ucation].

Senator Sellar: But you're striking that material.

Staff: And you're striking that material so um.

Senator Sellar: So, it will become part of basic education.

Staff: Not necessarily. It opens the door to allow it to be able to be part of basic education if that decision is made farther down the line um through budget negotiations or whatever, however it's decided.

Senator Sellar: I think we got caught in a revolving door.

Chair: [Sen. McAuliffe]: ....The reason for this amendment is that clearly in the ... substitute and the original bill the language said that this will not be part of basic education. There is, some opportunities that, or decisions that might be made down the line .... they will be made by the fiscal committee in line item budgets and it will not be part of this bill one way or another how that decision is reached. And I want to give them the flexibility to be able to make that decision without prohibiting that.... So it just makes it more flexible for the decision to be made on down the road.
CP at 2085-86 (emphasis added). Read in context, it appears that the amendment was intended to maintain flexibility and put off for another day whether learning improvement days and the other programs enumerated in RCW 28A.655.130 were part of basic education.
¶ 27 We hold Brown has failed to prove that learning improvement days are part of the basic education the State is constitutionally required to provide to all children of the state. Accordingly, he has not shown beyond a reasonable doubt that the legislature violated the constitution by reducing the number of days it was willing to fund.

D. INITIATIVE 732 COST-OF-LIVING INCREASE
¶ 28 Again, the education of our children, as a matter of constitutional law, is the paramount duty of our State. Education is a noble calling but those who answer that call often receive less compensation than if they applied their own education and talents to other endeavors. Worse yet, teachers, like law enforcement and other government workers, are often the first to suffer from government budget cuts.
¶ 29 Initiative 732 was intended to guarantee educators cost-of-living increases, in part to keep well qualified teachers from leaving education or the state. It is reported that Initiative 732 passed by a higher margin than any initiative in Washington's history. We are mindful of how important attracting and retaining highly qualified educators is to the future of our state.
¶ 30 The people have reserved to themselves the power to legislate directly through the initiative process. CONST. art. II, § 1(a). Because it is an exercise of legislative authority, we interpret and enforce initiatives just as we interpret and enforce laws passed by the legislature. See generally Love v. King County, 181 Wash. 462, 469, 44 P.2d 175 (1935). We interpret both as they are written, and not as we would like them to be written. Wash. State Republican Party v. State Pub. Disclosure Comm'n, 141 Wash.2d 245, 280, 4 P.3d 808 (2000).
¶ 31 As codified, the measure reads in most relevant part:
(1) School district employees shall be provided an annual salary cost-of-living increase in accordance with this section.
(a) The cost-of-living increase shall be calculated by applying the rate of the yearly increase in the cost-of-living index to any state-funded salary base used in state *348 funding formulas for teachers and other school district employees.
....
(c) Any funded cost-of-living increase shall be included in the salary base used to determine cost-of-living increases for school employees in subsequent years. For teachers and other certificated instructional staff, the rate of the annual cost-of-living increase funded for certificated instructional staff shall be applied to the base salary used with state-wide salary allocation schedule established under RCW 28A.150.410 and to any other salary models used to recognize school district personnel costs.
RCW 28A.400.205(1).
¶ 32 The core issue we must decide is the meaning of "state-funded salary base" and "base salary." Brown essentially argues that "base salary" means last year's salary. Essentially, the State argues that "base salary" means "derived base salary," the amount that the State pays for teachers and staff it requires school districts to hire for the 180 day instructional year according to an established formula, and does not include any optional work, including learning improvement days.
¶ 33 We apply standard rules of statutory construction to interpret initiatives. Wash. State Republican Party, 141 Wash.2d at 280, 4 P.3d 808. Thus, if the plain language of the initiative, read in its entirety, answers the questions before the court we need go no further. McGowan v. State, 148 Wash.2d 278, 288, 60 P.3d 67 (2002). Even if a statute is not ambiguous, we may turn to related statutes to interpret it. Campbell & Gwinn, L.L.C., 146 Wash.2d at 11-12, 43 P.3d 4. But we will turn to other extrinsic sources such as the voter's pamphlet, only if an initiative is ambiguous. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 671, 72 P.3d 151 (2003).
¶ 34 This court has already reviewed Initiative 732 once and struck a portion of it as unconstitutional. McGowan, 148 Wash.2d at 294, 60 P.3d 67. This was largely because the drafters of Initiative 732 attempted to constitutionalize the annual cost of living adjustment. See I-732, § 2(1)(d) ("[t]he state shall fully fund the cost-of-living increase in this section as part of its obligation to meet the basic education requirements under Article IX of the Washington Constitution.") Br. of Appellant App. F (emphasis added). The constitution, of course, cannot be amended by initiative; only by the formal amendment process laid out in article XXIII of our constitution. See, e.g., Gerberding v. Munro, 134 Wash.2d 188, 210 n. 11, 949 P.2d 1366 (1998). Since the initiative attempted to change the meaning of the constitution, we were constrained to rule that "[I-732] clearly [sought] to expand basic education in a way that is contrary to constitutional principles." McGowan, 148 Wash.2d at 294, 60 P.3d 67.
¶ 35 There were three overarching reasons for our holding in McGowan. First, Initiative 732 disassociated "the basic education requirement from any definition of basic education." McGowan, 148 Wash.2d at 293, 60 P.3d 67. Second, it "provides that a type of funding will be basic education, rather than specifying a type of education or educational service that is provided by the funding, or what instruction the funding relates to." Id. Finally it was structurally incompatible with the constitution and Seattle School District because it made it a constitutional mandate to fund staff performing non-basic education tasks originally paid for with levy funds. With every passing year, the State's contribution to the budgets of districts that had more staff originally paid for through local levies would increase in comparison to those districts that did not. Thus some districts would receive more state funding than others, quickly violating the constitutional command that the State provide a general and uniform education. McGowan, 148 Wash.2d at 293-94, 60 P.3d 67.[4]
¶ 36 The trial judge below concluded that we had already established that the average informed voter would not have read the term *349 "state-funded salary base" in a technical way and thus, he concluded, the 3.6 percent cost-of-living adjustment must be applied to the salary actually taken home the previous year. CP at 2361 (citing McGowan, 148 Wash.2d at 288, 60 P.3d 67). We disagree.[5]
¶ 37 Although in McGowan we were asked to interpret the same section of the initiative, the issue there was who pays and to whom. McGowan, 148 Wash.2d at 291-92, 60 P.3d 67. The issue before us today is what is to be paid as a matter of law. With respect to the question of what is to be paid, we find the terms "base salary" and "state-funded salary base," as used in the initiative are not ambiguous and are subject to only one reasonable interpretation. A reasonably informed voter would not interpret base salary as meaning last year's total compensation. The average voter, like the average worker, would understand that last year's salary may be decreased or increased by factors other than base pay. Last year's salary may have been reduced because of a temporary layoff or leave of absence. Last year's salary may have been increased because of overtime, bonuses, or other factors unrelated to base pay.
¶ 38 Learning improvement days are such a factor, and have been since they began as a pilot program. See LAWS OF 1993, ch. 336, § 301. The program has always been a local option; no school district is required to hold them. LAWS OF 1999, ch. 388, § 402. The establishing legislation provides for learning improvement days "to the extent funds are appropriated." E.g., LAWS OF 2002, ch. 371 § 503(7). The statute does not identify the number of days. Id.
¶ 39 While made optional by the legislature and optimal for the districts, demands may be made upon teachers by districts to attend learning improvement days. The analogy between workers who are required to work overtime and teachers who are required to work learning improvement days is clear. The average informed voter would not consider earnings from last year's overtime to be part of base pay.
¶ 40 Indeed, if the drafters of the initiative intended the cost-of-living increases to be based upon last year's income, they could have said so easily. Instead, the initiative stated that "[t]he cost of living increase shall be calculated by applying the rate of the yearly increase in the cost-of-living index to any state-funded salary base used in state funding formulas for teachers and other school district employees." RCW 28A.400.205(1)(a) (emphasis added). We conclude that the cost of living increases apply to the derived base salary as that term is used in this opinion and do not apply to learning improvement days or other optional wage components analogous to overtime.
¶ 41 Accordingly, we hold that "state-funded salary base used in state funding formulas" would not have been understood by the average voter to mean last year's take home pay, and that Brown has not established that the appropriation bill that changed the number of learning improvement days from three to two violated Initiative 732.

III
¶ 42 Because the trial court was able to grant relief based upon statutory grounds, it did not reach the constitutional claims raised by Brown. We can conceive of cognizable *350 arguments that, if proved, would establish learning improvement days as an essential component of the general and uniform system of education the State is required to provide. However, that case has not been made here and the record contains no evidence to support this substantive constitutional claim. Therefore, we hold that Brown has failed to meet his burden to prove that the State's reduction in learning improvement days from three to two is a violation of the paramount duty clause of our state's constitution, CONST. art. IX, § 1. We do not reach the remaining arguments.

IV
¶ 43 We hold that Brown has not established that learning improvement days are part of constitutionally required basic education. We further hold that Initiative 732 does not require a wage increase based on a 183 day work year when only a 182 day year was worked. The trial court is reversed.
WE CONCUR: ALEXANDER, C.J., C. JOHNSON, MADSEN, SANDERS, BRIDGE, OWENS, FAIRHURST and J.M. JOHNSON, JJ.
NOTES
[1] Under the act, schools must currently hire 49 certificated instructional staff per 1,000 students enrolled in kindergarten through third grade, 46 certificated instructional staff to 1,000 students grades 4 through 12, and 4 certificated administrative staff and 16.67 classified personnel to 1,000 students grades kindergarten though 12. RCW 28A.150.260(2)(b). Nothing in the act prevents school districts from hiring more teachers and staff if they have sufficient resources to do so, and from time to time the legislature has funded additional staffing beyond the requirements of the Basic Education Act. See, e.g., LAWS OF 2002, ch. 371, § 502(2)(a).
[2] The educational policy rationale requirement appears to be based on a well reasoned, but never appealed, 1983 decision of Superior Court Judge Robert J. Doran. See Seattle Sch. Dist. No. 1 v. State, No. 81-2-1713-1 (Thurston County Super. Ct. Sept. 7, 1983). This was a challenge to the adequacy of legislative measures taken to implement our Seattle School District No. 1 opinion, 90 Wash.2d 476, 585 P.2d 71, among other things. In that opinion, Judge Doran held, that any reduction in basic education spending is unconstitutional without an educational reason to do so.

We disagree with Brown that Judge Doran's opinion has preclusive effect on our deliberations today.
[3] "LEAP Document 1S" contains the raw data necessary to calculate the amount of funds needed. LAWS OF 2001, 2d Spec. Sess., ch. 7, § 503(2)(b).
[4] We also found that the attempt to enshrine the cost-of-living wage into the constitution was severable from the other requirements of the act, and thus required, as a matter of statutory law, the State to actually fund the cost-of-living raises, even for staff performing nonbasic education work, for that year. McGowan, 148 Wash.2d at 298, 60 P.3d 67.
[5] The trial judge may have over-relied on this language:

We do not believe that the average informed voter would understand "state-funded salary base" as a technical budgeting term used (1) to refer to the total salary expenditure for specified classifications of school district employees funded by the State and (2) to limit cost-of-living increases to only state-funded employees. Also, just because the method used to calculate cost-of-living increases involves state funding formulas/principles does not mean that the method used to make the calculation determines who must be paid.
McGowan, 148 Wash.2d at 291, 60 P.3d 67. But reading the two sentences together with the language of the initiative, ("The cost-of-living increase shall be calculated by applying the rate of the yearly increase in the cost-of-living index to any state-funded salary base used in state funding formulas for teachers and other school district employees." I-732, § 2(1)(a) (emphasis added)), McGowan does not stand for the principle that the people of this state did not intend to use state funding formulas.