202 P.3d 990 (2009)
SCHOOL DISTRICTS' ALLIANCE FOR ADEQUATE FUNDING OF SPECIAL EDUCATION, consisting of Bellingham School District No. 501, a municipal corporation; Bethel School District No. 403; Burlington-Edison School District No. 100, a municipal corporation; Everett School District No. 2, a municipal corporation; Federal Way School District No. 210, a municipal corporation; Issaquah School District No. 411, a municipal corporation; Lake Washington School District No. 414, a municipal corporation; Mercer Island School District No. 400, a municipal corporation; Northshore School District No. 417, a municipal corporation; Puyallup School District No. 3, a municipal corporation; Riverside School District No. 416, a municipal corporation; and Spokane School District No. 81, a municipal corporation, Appellants,
v.
The STATE of Washington; Gary Locke, in his capacity as Governor of the State of Washington; Terry Bergeson, in her capacity as Superintendent of Public Instruction; Brad Owen, in his capacity as President of the Senate and principal legislative authority of the State of Washington; Frank Chopp, in his capacity as Speaker of the House of Representatives and principal legislative authority of the State of Washington, Respondents.
No. 36294-5-II.
Court of Appeals of Washington, Division 2.
March 10, 2009.
*993 John Craig Bjorkman, Christopher Lee Hirst, Grace Tsuang Yuan, Robert Bertelson Mitchell, Jr., K&L Gates LLP, Seattle, WA, for Appellants.
William Gerard Clark, Office of the Attorney General, Newell David Smith, Attorney at Law, Seattle, WA, for Respondents.
Susan Kay Schreurs, Tacoma School District # 10, Tacoma, WA, Amicus Curiae on behalf of Tacoma School Dist. No. 10.
QUINN-BRINTNALL, J.
¶ 1 The School Districts' Alliance for Adequate Funding of Special Education ("the Alliance")[1] sought to have the courts declare statutes governing Washington State's special education funding process unconstitutional both facially and as applied. The trial court agreed with the Alliance that the 12.7 percent cap on the number of funded students was unconstitutional,[2] but it held that the Alliance had improperly excluded the basic education allocation (BEA) in calculating the amount of funding available to school districts for special education and, therefore, had not proven beyond a reasonable doubt that Washington's special education funding process violated article IX, section 1 of the Washington State Constitution. The Alliance appeals.[3]
¶ 2 We agree with the trial court that the Alliance failed to meet its burden to prove beyond a reasonable doubt that the statutes governing Washington's special education funding process are unconstitutional and affirm.

ANALYSIS

Washington State's Framework For Special Education
¶ 3 The Washington State Constitution in article IX, section 1 provides that "[i]t is the paramount duty of the [S]tate to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." Article IX, section 1 is not merely a statement of moral principle but, rather, sets forth a mandatory and judicially enforceable affirmative duty. Seattle Sch. Dist. No. 1 of King County v. State, 90 Wash.2d 476, 500, 585 P.2d 71 (1978).
¶ 4 In 1971, the legislature declared special education a part of the State's constitutional *994 obligation and established a state-wide special education program. Former ch. 28A.13 RCW (1990).[4] The Office of the Superintendent of Public Instruction (OSPI), in turn, established a regulatory framework governing special education. Former ch. 392-172 WAC. As a result, Washington's school districts are constitutionally required to provide special education services to any student with a qualifying disability that adversely affects his or her educational performance and requires special education. Former RCW 28A.155.020 (1995); former WAC 392-172-030,-035(2) (2001). And article IX requires the State to create and "provide for a general and uniform system of public schools," Wash. Const. art. IX, § 2, and must make "ample provision for the education of all children residing within its borders." Wash. Const. art. IX, § 1 (emphasis added).
¶ 5 Although the Alliance urges us to actively assert a paramount duty to educate children and "do more than review the Legislature's acts under a highly deferential standard," Br. of Appellant at 43, it is well established that courts have no such authority. "[W]here the constitutionality of a statute is challenged, that statute is presumed constitutional and the burden is on the party challenging the statute," here, the Alliance, "to prove its unconstitutionality beyond a reasonable doubt." Tunstall v. Bergeson, 141 Wash.2d 201, 220, 5 P.3d 691 (2000), cert. denied, 532 U.S. 920, 121 S.Ct. 1356, 149 L.Ed.2d 286 (2001). Unless a court is fully convinced that a statute violates the constitution, it lacks the authority to override a legislative enactment. Tunstall, 141 Wash.2d at 220, 5 P.3d 691 (citing Island County v. State, 135 Wash.2d 141, 147, 955 P.2d 377 (1998) (striking down statute authorizing creation of community counsel because the statute violated the state constitution as "special legislation" prohibited by article II, section 28(6)); State v. Clinkenbeard, 130 Wash.App. 552, 560, 123 P.3d 872 (2005) (upholding statute making it a class C felony for any school employee to have sexual intercourse with a registered student of the school who is at least 16 years old if there is an age difference of 5 years or more between the employee and the student)).
¶ 6 Whenever possible, a court must construe a statute as constitutional. State v. Farmer, 116 Wash.2d 414, 419-20, 805 P.2d 200, 812 P.2d 858 (1991). Notwithstanding the Alliance's argument to the contrary, there is no exception for challenges to the constitutionality of statutes designed to carry out article IX's "paramount duty." See Brown v. State, 155 Wash.2d 254, 266, 119 P.3d 341 (2005). Nor is there an exception for constitutional challenges to the appropriations act. See, e.g., Retired Pub. Employees Council of Wash. v. Charles, 148 Wash.2d 602, 623, 62 P.3d 470 (2003).
¶ 7 The practical effect of a court ruling that a statute is unconstitutional on its face is to render it "`utterly inoperative.'" Tunstall, 141 Wash.2d at 221, 5 P.3d 691 (quoting In re Det. of Turay, 139 Wash.2d 379, 417 n. 27, 986 P.2d 790 (1999), cert. denied, 531 U.S. 1125, 121 S.Ct. 880, 148 L.Ed.2d 789 (2001)). When addressing facial challenges to the constitutionality of a statute, our focus is on whether the statute's language violates the constitution, not whether the statute would be unconstitutional "as applied" to the facts of a particular case. Tunstall, 141 Wash.2d at 220-21, 5 P.3d 691 (citing JJR Inc. v. City of Seattle, 126 Wash.2d 1, 3-4, 891 P.2d 720 (1995)). "`[A] facial challenge must be rejected unless . . . no set of circumstances [exist] in which the statute can constitutionally be applied.'" Tunstall, 141 Wash.2d at 221, 5 P.3d 691 (quoting Turay, 139 Wash.2d at 417 n. 27, 986 P.2d 790).
¶ 8 In evaluating the Alliance's challenge that these statutes are unconstitutional on their face, we must determine first what article IX, section 1 requires and then decide whether the Alliance has provided sufficient evidence to prove beyond a reasonable doubt that there is no set of circumstances under which the legislature's statutory special education funding process could satisfy the minimum due under article IX, section 1.
¶ 9 Under an "as applied" challenge, the party challenging the statute contends that the statute, as actually applied, violated the constitution. Tunstall, 141 Wash.2d at *995 223, 5 P.3d 691 (citing Turay, 139 Wash.2d at 417 n. 27, 986 P.2d 790). Thus, under an "as applied" challenge, the Alliance must prove beyond a reasonable doubt that the legislature failed to adequately fund special education in their districts, forcing them to rely on levy funds. See Seattle Sch. Dist., 90 Wash.2d at 497-510, 585 P.2d 71 (holding that the State may not require districts to use local levy funds to make "ample provisions" for education because it is not a dependable and regular tax source).
¶ 10 On September 30, 2004, the Alliance sued the State, seeking judgment that the special education funding system, including the excess cost allocation and the Safety Net, is unconstitutional because it fails to provide sufficient funding and the school districts are forced to use local levy funds to cover special education costs in violation of article IX, section 1 of the Washington State Constitution.

Educational Funding Sources

A. Basic Education Act
¶ 11 In 1977, the legislature adopted the Washington Basic Education Act of 1977, RCW 28A.150.200, which provides for an annual BEA of state funds based on the average full-time equivalent student enrollment in each school district. The BEA is the same for all full-time equivalent students within a district, regardless of their ability or cost to educate. The component parts and methodology for computing the BEA are found in RCW 28A.150.250 and former RCW 28A.150.260 (1997), and declare: "Basic education shall be considered to be fully funded by those amounts of dollars appropriated by the legislature pursuant to RCW 28A.150.250 and 28A.150.260."[5] RCW 28A.150.250.

B. Special Education Funding System and Funding Formula

1. The Special Education Excess Funding Formula: BEA Plus
¶ 12 The special education process begins by identifying students with suspected disabilities and evaluating their needs. Former WAC 392-172-108 (2000). Districts may affirmatively search for such students or may simply evaluate students who are referred to them. Former WAC 392-172-10900 (2001).
¶ 13 The legislature provides special education funding on an "excess cost" basis. RCW 28A.150.390; Laws of 2005, ch. 518, § 507(1). As with the BEA, a district receives revenue calculated on a per capita allocation for each special education student in the district.[6] Like the BEA, the special education excess funding formula is based on an average cost: it is the additional cost of educating an average special education student, with average disabilities, in excess of the BEA for that student. The special education excess funding allocation is designed to pay for the excess cost of the student's specially designed instruction and any special education services over and above the cost of the student's basic education.
¶ 14 The legislature adopted the current special education funding formula in 1995 and has reenacted it every subsequent budget. Three studies regarding special education funding also support the 1995 formula. According to the 1995 Special Education Fiscal Study, during the 1993-94 academic school year, the average excess cost to fund a special education student was $3,109, in addition to the $3,559 each K-12 student received as the basic education allocation. Thus, the total average cost of educating a special education student was $6,668 or 1.87 times the cost of a basic education student.
¶ 15 Under the 1995 funding system, the legislature provides funds for special education through budget appropriations. Currently, section 507 of Laws of 2005, chapter 518, provides in relevant part:
a. Pursuant to RCW 28A.150.390, funding for special education is provided on an excess cost basis. ¶ 1.

*996 b. School districts shall ensure that special education students as a class receive their full share of the basic education apportionment. ¶ 1.
c. To the extent school districts can not [sic] provide an appropriate education for special education students through the basic education apportionment, services shall be provided using the special education excess cost allocation. ¶ 1.
d. OSPI shall use the excess cost methodology using the S-275 personnel reporting and other accounting systems to ensure that (a) special education students are basic education students first, (b) as a class, special education students are entitled to the full basic education allocation and (c) special education students are basic education students for the entire school day. ¶ 2(a).
e. Federal and state funds are distributed based on a headcount of special education students receiving specially designed instruction in accordance with a properly formulated [Individualized Education Program]. ¶¶ 4 and 5.
f. The special education allocation for disabled children birth through two is the average headcount of those children multiplied by the districts average basic education allocation per each basic education [full-time equivalent], multiplied by 1.15. For disabled children ages 3 to 21 the multiplier is 0.9309 times the average [BEA] times the "enrollment percent" of special education students to basic education students in that district. ¶ 5(a).
g. The special education funding is limited to a maximum of 12.7 percent of the general student population for each district. ¶ 6(a).[[7]]
2 Clerk's Papers (CP) at 300-01; see Laws of 2005, ch. 518, § 507.

2. The Safety Net
¶ 16 In addition to the BEA and the standard special education funding allocation, the legislature provided a funding procedure for those special education students whose educational needs exceed approximately $15,000 per academic year. Laws of 2005, ch. 518, § 507. This funding is referred to as the Safety Net. The Safety Net system is designed to provide more money to districts that are not adequately funded under the standard formula.
¶ 17 Also, under the 1995 funding system, the legislature laid out provisions for the Safety Net. Specifically, section 507 provides in relevant part:
h. A Safety Net is provided [and it] serves as a method for districts with demonstrated need for special education funding beyond the amounts provided above to secure that additional funding. ¶ 8.
i. The Safety Net oversight committee. . . awards Safety Net funds. ¶ 8.
j. The [Safety Net oversight c]ommittee first considers unmet needs for districts that can convincingly demonstrate that all legitimate expenditures for special education exceed all available revenues from state funding formulas. ¶ 8(a).
k. The [Safety Net oversight c]ommittee then considers the extraordinarily high cost needs of one or more of a district's special education students. ¶ 8(b).
2 CP at 301; see Laws of 2005, ch. 518, § 507.
¶ 18 The Safety Net system provides additional funds to districts that can demonstrate that they are not adequately funded under the BEA and the special education excess cost allocation tiers of the formula. Presently, Safety Net funds are available for students whose excess cost of special education services exceeds approximately $15,000 and federal funds are available for excess costs above $21,000.

a. Applying for Safety Net Funds
¶ 19 The legislature mandates that the Safety Net Oversight Committee award Safety Net funds to applicant districts using a *997 two-step process. First, the district must "convincingly demonstrate that all legitimate expenditures for special education exceed all available revenues from state funding formulas" by completing Worksheet A, one portion of the Safety Net application. Laws of 2005, ch. 518, § 507(8)(a); see WAC 392-140-626. Financial need on Worksheet A does not entitle a district to additional funding. Worksheet A is a partial accounting of a district's special education revenues and expenditures; it does not account fully for all revenues, such as the BEA. WAC 392-140-626. Completion of Worksheet A does not entitle a district to Safety Net funding; the committee will only award a district Safety Net funding for direct special education and related services identified in an appropriate, properly prepared and formulated Individualized Education Program. But the committee must also consider additional available revenues from federal sources. Differences in program costs attributable to district philosophy, service delivery choice, or accounting practices are not a legitimate basis for Safety Net awards. Laws of 2005, ch. 518, § 507(8)(a); see WAC 392-140-605.
¶ 20 Next, the committee considers the extraordinarily high-cost need of one or more individual special education students. Laws of 2005, ch. 518, § 507(8)(b); WAC 392-140-600 through-685. A district with demonstrated need, or maximum eligibility, under Worksheet A must then complete Worksheet C for each extraordinary high-cost student. Laws of 2005, ch. 518, § 507(8)(b); WAC 392-140-605(3). Worksheet C is a required part of every Safety Net application. Laws of 2005, ch. 518, § 507(8)(b); WAC 392-140-605(3). Worksheet C accounts fully for all revenues (the BEA and the special education excess cost allocation) as well as the expenses for high-cost individual students for whom Safety Net funding may be provided. A district establishes entitlement to Safety Net funding for a particular student based on the "[m]aximum [i]ndividual [n]eed [d]emonstrated for [that] [s]tudent." Ex. 60, p. 1785.
¶ 21 A district's total annual Safety Net award for all of its extraordinarily high-cost students may not exceed the district's maximum funding eligibility, or demonstrated need, on Worksheet A. WAC 392-140-605(2), -626(2).

b. F-196 Reports
¶ 22 The Worksheet A analysis is based largely on revenue and expenditure data taken from the F-196 reports. The F-196 reports are annual financial documents that school districts submit to the State that list education revenues by source and account for expenditures by program.[8] For example, the state basic education revenues are in account "3100" and special education excess cost revenues are in account "4121." District education expenditures are coded by district personnel and, while the F-196 reports code basic education expenditures and special education expenditures separately, the F-196 reports do not show which of the basic education expenditures were incurred on behalf of special education students.

c. 1077 Process
¶ 23 The purpose of the 1077 accounting methodology is to provide a uniform statewide allocation of basic education support for special education and it is limited to a portion of certified special education teachers and a small portion of non-staff special education costs. The 1077 methodology allocates costs; it does not allocate revenue or identify sources of revenue. The 1077 worksheet is a series of complicated calculations that allocate the cost of special education teachers whose duties are part basic education and part special education. Typically, special education teacher costs are allocated 38 percent to basic education and 62 percent to special education. The 1077 methodology establishes the minimum support that the special education students' BEA is supposed to provide, with the maximum being the special education students' entire BEA. When a special education student moves out of the basic education classroom, the BEA follows that student into the special education classroom and is applied to special education costs.

*998 The Alliance's Challenge
¶ 24 As it did below, on appeal, the Alliance argues that the F-196 reports demonstrate the unfunded difference between districts' special education costs and all available state and federal special education revenues. Specifically, the Alliance contends that, for the 2004-05 school year, the F-196 reports show statewide underfunded special education costs of $147 million.
¶ 25 The State responds that the F-196 reports did not demonstrate a special education funding deficit because the Alliance failed to include the BEA revenues that every special education student receives in its calculations. The Alliance concedes that simply finding a disparity between what districts spend on special education and what revenues the State provides those districts is insufficient to prove underfunding and it acknowledges that it did not include the BEA in its calculations. Nevertheless, the Alliance argues that, because Safety Net funding is only available for extraordinarily high-cost students, when a district's demonstration of need results from a cause other than having extraordinarily high-cost students, that district is precluded from applying for and receiving full funding. See Laws of 2005, ch. 518, § 507(8)(b); see also WAC 392-140-605(2). Because of this, during the 2005-06 academic year, the Alliance contends that districts were able to apply for only about $35 million for their extraordinarily high-cost students out of the approximately $147 million in collective demonstrated need.
¶ 26 The Alliance contends that it appropriately excluded the BEA from its calculations using Worksheet A and the F-196 reports because the 1077 methodology proves that all BEA funds are consumed by each student's basic education costs. And, under the 1077 accounting methodology, the Alliance contends, districts are required to reallocate a portion of the special education expenditures to basic education. The 1077 methodology assumes that special education students (1) receive their appropriate share of basic education support from basic education staff when served in the regular classroom and (2) basic education dollars follow them to partially support special education services they receive when they are served outside their regular classroom. Thus, the Alliance argues, because each student's BEA is consumed by basic education, both in the basic education classroom and the special education classroom, it can be properly excluded from special education funding calculations.
¶ 27 For the first time in its reply brief, the Alliance appears to argue that the BEA should not be considered when calculating the deficit in special education funding because article VIII, section 4 of the Washington State Constitution requires that the legislature specify both the amount and the object of any appropriation. And during oral argument, the Alliance indicated that, because section 502 funds basic education and section 507 funds special education, school districts cannot use basic education funds, such as the BEA, toward a student's specially designed instruction. But the purpose of the BEA is to educate all of the children in the State of Washington and "to fund those program requirements identified in RCW 28A.150.220." RCW 28A.150.250. And the BEA allocated to one child can be used to pay for the education of that child, both in the basic education classroom and the special education classroom. To require itemization of each dollar of each child's BEA is not feasible and there is no constitutional requirement for such an accounting.
¶ 28 In addition, the Alliance has not proved that the special education cost multiplier, 0.9309, is inadequate. The evidence below clearly established that this multiplier is consistent with current national data on the total average excess cost of educating a student receiving special education.

The Alliance's Evidence of Underfunding
¶ 29 The Alliance argues that substantial evidence does not support the trial court's findings that Worksheet A, the F-196 reports, and the 1077 methodology do not show the funding deficit for special education that the Alliance claims. We disagree.
¶ 30 The Alliance's arguments do not establish beyond a reasonable doubt that the *999 special education funding scheme is unconstitutional on its face or as applied. The F-196 reports, Worksheet A, 1077 methodology, and related testimony do not show the funding deficit for special education that the Alliance claims. The Alliance's funding deficit calculations based on Worksheet A and the F-196 reports failed to account for all the revenue available to pay the cost of educating special education students. As an initial matter, we note that the Alliance did not challenge the adequacy of the BEA and no evidence in the record before us supports the bringing of such a challenge. In addition, the Alliance improperly excludes the BEA from its calculations. And the Alliance's reliance on the 1077 methodology is misplaced because it is solely an allocation of costs and does not allocate costs or identify sources of revenue.
¶ 31 Moreover, under the statutory funding plan, the Safety Net is not the only approach to address the constitutional imperative to fund special education. And the Safety Net does not unconstitutionally limit districts' access to ample Safety Net funding.

A. F-196
¶ 32 The Alliance argues that the trial court erred when it found that the F-196 reports did not show underfunding at the level the Alliance alleged because the Alliance did not take into account the BEA that all students are entitled to or the special education excess cost allocation that all students receiving special education are entitled to. Substantial evidence supports the trial court's finding that the F-196 reports do not demonstrate underfunding.
¶ 33 The F-196 reports at issue include an accounting of special education expenditures from the state and federal government. In addition, the reports include an accounting of revenue the district received, including the BEA, the special education cost allocation, the federal Individuals with Disabilities Education Act, 20 U.S.C.A. § 1400, federal Medicaid reimbursement revenue, and often a small amount received from other districts for transfer students. The Alliance compiled these statewide reports of special education expenditures and revenue, totaled expenditures and revenues, and concluded that the resulting figures represented the funding deficit. But because the Alliance failed to account for all the revenue it had available to pay the cost of educating special education students, this evidence does not prove that special education is underfunded at the level the Alliance claims. While the F-196 reports include all of the above information, the Alliance failed to include the BEA in its calculations.
¶ 34 For example, the Alliance claimed that it experienced a $147 million deficit during the 2004-05 school year and this number includes a $1,305,776 deficit for the Bellingham School District. But the accounting for that district lists $8,339,487 as the cost of special education and that number is the sum of both the state and supplemental federal funding shown on the Bellingham School District's F-196 report. The Alliance's report lists $7,033,711 as the revenue to pay those same costs and is the sum of four of the five revenue sources listed above but not the $5.4 million in BEA that the Bellingham School District received that year for its 1,279 special education students. Thus, the accounting methodology on which the Alliance relies to demonstrate the underfunding is incomplete and misleading. Furthermore, the Alliance's expert, Dr. Tom Parrish, testified that the F-196 reports alone cannot establish underfunding of special education. Thus, substantial evidence supports the trial court's finding that the F-196 reports do not establish underfunding and the Alliance has not met its burden to prove that the statutes governing Washington's special education funding process are unconstitutional beyond a reasonable doubt.

B. Worksheet A
¶ 35 Next, the Alliance argues that Worksheet A's $147 million "demonstration of need" for Safety Net applicants for the school year 2005-06 "conclusively proves underfunding." Br. of Appellant at 29. Specifically, the Alliance argues that, because Worksheet A requires districts to total up their allowed special education expenditures and subtract "all revenue available for special education," the remaining balance is the *1000 amount that the formula has underfunded them. Br. of Appellant at 30. Furthermore, the Alliance argues that its failure to include the BEA in its calculations is not fatal because the State does not "require districts to count their BEA in calculating demonstration of need."[9] Br. of Appellant at 30. Again, we disagree.
¶ 36 Here, Worksheet A is only the first step in applying for Safety Net funding. Although the Alliance correctly argues that Worksheet A does not require it to take the BEA into account, Worksheet C, which is required to apply for Safety Net funds, does. In addition, a showing of financial need on Worksheet A does not automatically entitle a district to Safety Net funding; the district must also submit accounting for improperly prepared individual education plans for each high-cost student. Because the Alliance calculated its alleged deficit based on only one portion of the Safety Net application and failed to take into account incorrectly prepared individual education plans, substantial evidence supports the trial court's finding that Worksheet A fails to demonstrate underfunding. Differences in program costs attributable to district philosophy, service delivery choice, or accounting practices are not a legitimate basis for Safety Net awards. Laws of 2005, ch. 518, § 507; see WAC 392-140-605.

C. 1077 Methodology
¶ 37 Next, the Alliance argues that it properly excluded the BEA contributions from the State's 1077 methodology accounts for all special education students and that the 1077 methodology proves that the entire BEA is consumed by basic education. We disagree.
¶ 38 The Alliance's argument regarding why the 1077 methodology permits it to properly exclude the BEA from its calculations is unclear. It appears that the Alliance is arguing that, because all students are basic education students, with some receiving special education, the BEA is necessarily consumed providing these students with their basic education-regardless of whether that basic education occurs in the basic education classroom or in special education classrooms. As a result, the Alliance seems to argue that the BEA is always entirely consumed before a student's special education costs are incurred.
¶ 39 But when a student leaves the basic education classroom in order to receive special education, that student may be receiving his or her "basic education," but that student is undeniably also receiving "special education." The Alliance fails to indicate why the classroom placement eliminates the need to address the BEA in its calculations. The child receiving special education instruction cannot be in two classrooms at once. While in the special education classroom, he is not receiving services in the former classroom. Furthermore, the 1077 methodology identifies special education costs in the district's F-196 reports, but it does not allocate revenue or identify sources of revenue and, thus, it is not evidence that the Alliance properly excluded the BEA from its calculations. Substantial evidence supports the trial court's finding that the Alliance could not properly exclude the BEA from its calculations. The Constitutionality of the Special Education Funding Scheme

A. The Adequacy of the Excess Special Education Cost Multiplier (0.9309) and the BEA
¶ 40 The Alliance argues that the trial court erred when it held that the special education excess cost multiplier, 0.9309, was "rational" because (1) the multiplier is applied against the BEA rather than basic education expenditures and (2) the research the trial court relied on was outdated. We disagree.

1. The Adequacy of the Special Education Excess Cost Multiplier (0.9309)
¶ 41 First, the Alliance argues that the research on which the trial court based its decision is outdated and meaningless because *1001 "the current educational research shows that the total excess cost of special education is 90 percent of basic education expenditures, not 90 percent of what the Legislature chooses to fund for basic education with the BEA." Br. of Appellant at 35-36. We disagree.
¶ 42 The Alliance has not challenged the BEA's adequacy. Moreover, it ignores that the BEA does, in fact, represent the cost of basic education and, as it is adjusted annually, continues to be the cost of basic education. Furthermore, this formula reflects both local and national experience regarding the total average cost of special education. In addition, a 2006 study employing a derivative of the BEA for special education funding supports the BEA. The Alliance suggests that the State failed to prove that the special education excess cost multiplier actually produces funds equal to today's average cost of providing special education services to a student with average disabilities; but it is the Alliance, not the State, that bears the burden of proving by a preponderance of the evidence that the BEA multiplier is inadequate. See Tunstall, 141 Wash.2d at 220, 5 P.3d 691. Substantial evidence supports the trial court's finding that the special education cost multiplier is an adequate funding calculation to allocate for average special education costs.

2. The Adequacy of the BEA
¶ 43 Next, the Alliance argues that the trial court erred when it found that "the adequacy of the BEA [was] not an issue before [it]" because the difference between basic education expenditures and the BEA was a factual issue relevant at trial. Br. of Appellant at 38. Specifically, the Alliance argues that its challenge to the special education funding scheme necessarily includes a challenge to the BEA because the special education formula is a multiple of the BEA, rather than basic education expenditures. We disagree.
¶ 44 Here, the Alliance's only evidence that it challenged the adequacy of the BEA at trial is an exhibit it introduced regarding the 1077 methodology and testimony by district personnel that the BEA is exhausted by basic education costs. But in its complaint, the Alliance admittedly did not seek declaratory relief with respect to the BEA; instead, it sought relief regarding only the constitutionality of the special education funding scheme and, thus, a challenge to the adequacy of the BEA is outside the scope of its complaint. See In re Marriage of Leslie, 112 Wash.2d 612, 617, 772 P.2d 1013 (1989) (a court has no jurisdiction to grant relief beyond that sought in the complaint). Because Alliance did not challenge the adequacy of the BEA below, it may not do so on appeal.[10]Martin v. Johnson, 141 Wash.App. 611, 617, 170 P.3d 1198 (2007) (holding that, generally, appellate courts will not review an issue raised for the first time on appeal); see RAP 2.5(a).

B. The Safety Net

1. Constitutionality of the Safety Net on its Face
¶ 45 Next, the Alliance argues that the Safety Net unconstitutionally limits districts' access to ample Safety Net funding because it is limited to funding districts' extraordinarily high-cost students. Here, the Alliance argues that this "structural defect renders the funding system unconstitutional" on its face. Br. of Appellant at 25. Specifically, the Alliance argues that the Safety Net denies districts ample state funding as article IX, section 1 requires because it denies them the ability to ask for additional funding for "medium-cost" students who fall above the special education excess cost allocation but below the Safety Net minimum of approximately $15,000. We disagree.
¶ 46 Although the Alliance argued extensively in its briefing that the special education funding scheme was unconstitutional on its face, it appeared to abandon that argument during oral arguments, focusing instead *1002 on an "as applied" challenge as to "medium-cost" students whose expenses fall below the minimum Safety Net amount of approximately $15,000 but above the BEA plus the special education excess funding award. We address this argument below.
¶ 47 In order to determine if the Safety Net violates article IX, section 1, we must first examine what article IX, section 1 requires and then determine whether there is any set of circumstances under which the acts of the legislature could satisfy article IX, section 1. Article IX, section 1 states that the State's "paramount duty" is to make "ample provision for the education of all children. . . without distinction or preference on account of race, color, caste, or sex," and this substantive provision of our constitution imposes a judicially enforceable affirmative duty. Seattle Sch. Dist., 90 Wash.2d at 499, 513, 585 P.2d 71. As a result, all children in Washington, including those requiring a special education, "have a `right' to be amply provided with an education. That `right' is constitutionally paramount and must be achieved through a `general and uniform system of public schools.'" Seattle Sch. Dist., 90 Wash.2d at 513, 537, 585 P.2d 71; see also Newman v. Schlarb, 184 Wash. 147, 153, 50 P.2d 36 (1935) (duty imposed upon legislature to provide "`a general and uniform system of public schools'") (quoting Sch. Dist. No. 20, Spokane County v. Bryan, 51 Wash. 498, 502, 99 P. 28 (1909)).
¶ 48 It is well settled law that, in order to fulfill this broad constitutional duty, the legislature must provide sufficient funds "to permit school districts to provide `basic education' through a basic program of education in a `general and uniform system of public schools.'" Seattle Sch. Dist., 90 Wash.2d at 482, 522, 585 P.2d 71 (emphasis omitted). Local levies cannot fund basic education but can be used to fund programs other than basic education. Seattle Sch. Dist., 90 Wash.2d at 526, 585 P.2d 71. But our Supreme Court has ruled that it is the legislature's duty to determine what constitutes basic education and the legislature has the authority to select the means to discharge this duty and the judiciary, including the trial court and this court, should restrain its role to providing only broad constitutional guidelines within which the legislature may work. Seattle Sch. Dist., 90 Wash.2d at 518-20, 585 P.2d 71.
¶ 49 The constitutional test here is whether there is any set of circumstances that permits a conclusion that school districts receive sufficient money from the State to pay the districts' costs of providing a basic education to the districts' special education students. The language of the Safety Net permits that conclusion. The conditions and limitations in the Safety Net do not create the impediment to access of the Safety Net awards that the Alliance claims. First, the Safety Net Committee "shall consider unmet needs for districts that can convincingly demonstrate that all legitimate expenditures for special education exceed all available revenues from state funding formulas," Laws of 2005, ch. 518, § 507(8)(a), and, second, "[t]he committee shall then consider the extraordinarily high cost needs of . . . special education students." Laws of 2005, ch. 518, § 507(8)(b). These provisions do not, on their face, unconstitutionally limit districts' access to Safety Net funds as the Alliance alleges.
¶ 50 Here, the special education funding statute makes ample provisions for educational services for children who require special education and, through use of the BEA, the special education excess cost formula, and the Safety Net, there are circumstances under which the funding statute can and is being constitutionally applied. And, as our Supreme Court has often held, "it is not this court's role to micromanage education in Washington." Tunstall, 141 Wash.2d at 223, 5 P.3d 691 (citing Tommy P. v. Bd. of County Comm'rs of Spokane County, 97 Wash.2d 385, 398, 645 P.2d 697 (1982) (legislature's need to customize education programs recognized)); Seattle Sch. Dist., 90 Wash.2d at 520, 585 P.2d 71 ("While the Legislature must act pursuant to the constitutional mandate to discharge its duty, the general authority to select the means of discharging that duty should be left to the Legislature."). Consequently, we exercise judicial restraint and hold that, under article IX's broad constitutional guidelines, the Safety Net is constitutional on its face. See *1003 Seattle Sch. Dist., 90 Wash.2d at 518, 585 P.2d 71 (judiciary required to provide broad constitutional guidelines regarding education within which legislature may work).

2. Constitutionality of the Safety Net: As Applied
¶ 51 The Alliance contends that the Safety Net, as applied, is unconstitutional because Worksheet A produces a "demonstration of need" of $147 million while it could only apply for $35 million in Safety Net funding. It alleges that the remainder, approximately $112 million, reflects underfunding for those medium-cost students whose cost of service is below the Safety Net extraordinarily high-cost threshold of approximately $15,000 but whose services are more expensive than the BEA plus the special education excess cost allocation. Because the Alliance did not offer evidence that the Safety Net's limitation to high-cost students actually creates a funding deficit, its "as applied" challenge fails.
¶ 52 An "as applied" challenge to the constitutionality of a statute is "characterized by a party's allegation that application of the statute in the specific context of the party's actions or intended actions is unconstitutional"; but this does not totally invalidate that statute, only future application of the statute in a similar context. City of Redmond v. Moore, 151 Wash.2d 664, 668-69, 91 P.3d 875 (2004). We presume that a statute is constitutional and the party challenging the statute as applied bears the burden of proving its unconstitutionality beyond a reasonable doubt. Madison v. State, 161 Wash.2d 85, 92, 163 P.3d 757 (2007) (quoting State v. Thorne, 129 Wash.2d 736, 769-70, 921 P.2d 514 (1996)).
¶ 53 The Alliance did not present reports or analyses to support its contention that medium-cost students account for the alleged deficit. Under the present special education funding process, a district must expend all of the BEA and all of the excess cost allocation received for its special education students before the district can contend that the legislature has underfunded its special education program. But the evidence on which the Alliance relies, Worksheet A and the F-196 reports, do not demonstrate such underfunding. The documents are incomplete because they do not adequately take into account the BEA or the excess cost allocation and, as a result, substantial evidence supports the trial court's findings that the evidence does not demonstrate underfunding. Furthermore, Dr. Parrish testified that evidence that expenditures exceed revenues alone is insufficient to prove a shortfall or inadequate funding because, in order to determine whether special education is underfunded, one must first discern a national standard and then apply Washington's practices and expenditures against that national standard. Thus, the Alliance failed to demonstrate, beyond a reasonable doubt, that Washington's special education funding program underfunds special education and that the statutes governing access to and allocation of special education funds to individual school districts are unconstitutional.
¶ 54 Although we may direct that it act, the general authority to select the means of discharging its duty to fund education rests with the legislature. Moreover, it is not our role to micromanage education in Washington. Tunstall, 141 Wash.2d at 223, 5 P.3d 691. Because the Alliance has not met its burden to prove beyond a reasonable doubt that the special education funding process the legislature enacted to fund special education in Washington violated article IX, section 1, we affirm.
We concur: HOUGHTON, P.J., and BRIDGEWATER, J.
NOTES
[1] The Alliance is made up of the following school districts: Bellingham School District No. 501, Bethel School District No. 403, Burlington-Edison School District No. 100, Everett School District No. 2, Federal Way School District No. 210, Issaquah School District No. 411, Lake Washington School District No. 414, Mercer Island School District No. 400, Northshore School District No. 417, Puyallup School District No. 3, Riverside School District No. 416, and Spokane School District No. 81.
[2] The State has not appealed this ruling. Moreover, in the 2007 session, the legislature revised the Safety Net provisions to create a funding category for districts with large numbers of families with disabled children. Laws of 2007, ch. 522, § 507(8)(c). Thus, the trial court's ruling eliminating the 12.7 percent cap is not an issue in this appeal.
[3] A group of 72 additional school districts join the Alliance as amicus curiae in asking this court to declare Washington's special education funding system unconstitutional. Together, the Alliance and the amicus districts serve 62 percent of Washington's students receiving special education services.
[4] Former ch. 28A.13 RCW has been recodified as ch. 28A.155 RCW.
[5] The Alliance does not challenge ch. 28A.150 RCW or the special education laws, ch. 28A.155 RCW.
[6] The population of students receiving special education services is calculated differently; it is a head count of all students in the district receiving special education services, without conversion to full-time equivalency.
[7] See note 2, supra.
[8] Similar revenue and expense accounting entries summarize federal and local programs.
[9] The State argues that inclusion of the BEA in Worksheet A actually results in a $37,829,614 surplus for the Alliance.
[10] Although the Alliance alleges in its brief that it "proved the fact that the BEA does not cover districts' basic education expenditures by a preponderance of undisputed evidence," it fails to point us to any place in the voluminous record where it challenged the adequacy of the BEA. Br. of Appellant at 39. Furthermore, as stated above, it admittedly did not seek declaratory relief with respect to basic education underfunding.